IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
PECOS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § | |
| v. | § § | P:20-CR-00330-DC |
| (1) SANTIAGO CORDOVA-ESPINOZA, | § § § | |
| *Defendant*. | § | |

## ORDER DENYING MOTION TO SUPPRESS

BEFORE THE COURT is Defendant Santiago Cordova-Espinoza's (Defendant) Motion to Suppress filed on July 27, 2020. (Doc. 13). On July 9, 2020, Defendant was charged with re-entry after deportation, in violation of 8 U.S.C. § 1326. (Doc. 8). Defendant moves to suppress the agents' observation of Defendant at the OYO Hotel in Alpine, Texas, where he was found, as well as his identity and immigration file, alleging a Fourth Amendment violation occurred. (Doc. 13). The Government filed a timely[1] Response opposing the Motion to Suppress on August 12, 2020. (Doc. 19). On August 16, 2020, Defendant filed a Motion for Leave to File Reply in Support of Motion to Suppress, which the Court granted the following day. (Doc. 20; Text Only Entry, Aug. 17, 2020). Defendant's Reply was docketed on August 17, 2020. (Doc. 21). The Court conducted an evidentiary hearing on August 17, 2020.[2] (Doc. 23). Finally, on August 24, 2020, with the Court's leave, the Government filed a Sur-reply. (Doc. 25). After due consideration of the parties' arguments, the evidence, and the applicable law, the Court **DENIES** Defendant's Motion to Suppress. (Doc. 13).

---

1. The Government moved to extend the deadline to file a response. (Doc. 16). The Court granted the Government's request, extending the response deadline to August 12, 2020. (Text Only Entry, Aug. 4, 2020).
2. An Uncertified Transcript was produced on October 22, 2020, for purposes of ruling on the instant Motion to Suppress.

I.  FACTUAL BACKGROUND

At the hearing, the Government presented the testimony of Homeland Security Investigations (HSI) Agent David Ferg (Agent Ferg) and HSI Agent Ryan Drake (Agent Drake). Defendant presented the testimony of Yogesh Patel (Mr. Patel) and HSI Agent Coleman Boring (Agent Boring). Moreover, Defendant introduced his affidavit[3] and two photos of the OYO Hotel. Def.'s Ex. 1, 2, 3.

**A. The Investigation**

A day or two before June 1, 2020, Agent Boring received a call from an officer with the Brewster County Sheriff's Office (BCSO) regarding a vehicle stop involving a black GMC Terrain and two individuals. One of the individuals was named Esteban Trevino (Trevino) and the other Kaitlin Thomas (Thomas). Agent Boring was informed the vehicle was stopped because it was suspected of being involved in illegal activity—either narcotics or alien smuggling. Moreover, the black GMC was impounded because the driver did not have a driver's license. The BCSO released the black GMC with the intent to place it under surveillance to determine its destination.

On or about June 1, 2020, Agent Boring and other agents were advised by fellow HSI Agent Jason Manyx (Agent Manyx) that the United States Border Patrol Office in Alpine, Texas communicated to him that three undocumented aliens were being housed at the OYO Hotel, Room 115. The OYO Hotel is located in Alpine, Texas. Agent Manyx subsequently gathered Agents Boring, Drake, Ferg, and Mark Hoffart (Agent Hoffart) and proceeded to the OYO Hotel.

---

3. The only relevant facts in Defendant's affidavit which are corroborated by the testimony provided by other witnesses are that the agents knocked on the door for some time, the occupants did not answer, the door opened after some time, and the agents were "there and talked to [the occupants.]" *See* Cordova-Espinoza Aff. 1.

### B. The Scene

Agents Manyx, Boring, Drake, Ferg, and Hoffart were the first to arrive at the OYO Hotel. HSI Agent Elizabeth Hancock arrived on the scene shortly thereafter. Officers with the BCSO and the United States Border Patrol were also present, including Sheriff Ronny Dodson.

Mr. Patel, the owner and manager of the OYO Hotel, credibly testified HSI agents arrived at the hotel at approximately 1:30 p.m., and inquired regarding Room 115 and its occupants. Specifically, Agent Ferg and Agent Hoffart were asked by their supervisor to speak with the manager to gather information. Thereafter, Agents Ferg and Hoffart entered the OYO Hotel's office and briefly spoke to a female behind the desk. They explained why they were there and the room they were interested in. Because there was a language barrier, after some time, Mr. Patel came out. Agents Ferg and Hoffart once again explained why the officers were there and asked for information on the occupants of Room 115.

Mr. Patel provided agents the name of the female who rented Room 115 and told them that after she was handed the key, she allowed three unknown persons to stay in the room. HSI agents also learned that there was a second room rented the night prior by the same individuals that occupied Room 115. According to multiple witnesses on the scene, the same individuals were seen entering and exiting Room 115 and the second room. Agent Boring credibly testified the witnesses, including maintenance personnel, gave detailed descriptions of the individuals seen in both rooms. Agents Drake and Ferg obtained similar accounts from witnesses. The occupancy of the second room ended before the agents arrived at the OYO Hotel.

During Agent Ferg's conversation with Mr. Patel, Mr. Patel asked about opening the hotel room door. Agent Ferg informed Mr. Patel that he needed to speak with his supervisor first. Moreover, during this time, Agent Boring verified the information provided by the BCSO

regarding the black GMC and observed that the same people previously detained were traveling in the vehicle—Trevino and Thomas.

The agents knocked on the door of Room 115 approximately four or five times in an effort to execute a knock and talk after speaking to Mr. Patel and several witnesses. However, the knock and talk was not successful.

### C.  Mr. Patel Opens the Door

After Mr. Patel observed the officers struggle to get an occupant to answer the door, Mr. Patel opened the door without being asked to do so by law enforcement. When he opened the door, Mr. Patel observed three people in the room and the woman to whom he rented the room.

Agent Drake credibly testified that before the door was opened, he was standing near one of the trucks, roughly twenty (20) feet from Room 115, with his back to the door of Room 115 when Mr. Patel approached him. Mr. Patel asked if the agents wanted to get inside the room. Agent Drake responded by informing Mr. Patel that the officers had attempted a knock and talk and that nobody answered. Agent Drake explained to Mr. Patel that the occupants "have a reasonable expectation of privacy from the Government" but in the midst of the conversation, Mr. Patel walked past him toward the door. Agent Drake stated he followed Mr. Patel from a roughly ten-foot distance. Mr. Patel then opened Room 115. After opening the door, Mr. Patel turned around and walked away, leaving the door wide open and allowing Agent Drake to observe two individuals in the room. Agent Drake testified that when Mr. Patel continued to walk toward Room 115, he (Agent Drake) did not know what Mr. Patel was doing, and in response to questioning stated he had no idea that Mr. Patel would unlock and open the door. For all he knew, as he testified, Mr. Patel may have been planning to knock on the door as the agents had done.

When the door was opened, Agent Boring was standing by Agent Drake's unit attempting to call the sector radio to obtain additional information on a possible license plate associated with the black GMC. Agent Boring observed from some distance how Mr. Patel opened the door to Room 115. Agent Boring credibly testified he did not know Mr. Patel was going to open Room 115 and that, to his knowledge, none of the agents asked Mr. Patel to open the door to Room 115. When the door was opened, Agent Boring immediately observed two individuals inside Room 115, Mr. Patel tense up, and Mr. Patel walk away from the room.

Mr. Patel testified he opened Room 115 because he had suspicions that something illegal was happening based on the series of events that transpired when he rented other rooms to the same individuals, he did not want anything illegal taking place in his hotel, and he believed "[he had] the right to open [his] room." Mr. Patel was hoping he would help the agents in their investigation because at some point they mentioned that they may have to go through a long process to get a search warrant to get into the room and might possibly have to break the door to gain entry. Mr. Patel was not compensated or offered compensation in exchange for opening the door.

### D. Subsequent Actions

After the door was opened, Agent Drake approached the entrance to the door and made himself known to the two people inside. Agent Boring also approached Room 115 and engaged in a conversation with the occupants.

### II. LEGAL STANDARD

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend IV. The Supreme Court has determined warrantless searches and

seizures are per se unreasonable unless an exception to the warrant requirement is applicable. *See Katz v. United States*, 389 U.S. 347, 357 (1967).

Evidence that law enforcement officers obtain in violation of the Fourth Amendment is subject to suppression under the exclusionary rule. *United States v. Massi*, 761 F.3d 512, 520 (5th Cir. 2014). "[T]he exclusionary rule encompasses both the primary evidence obtained as a direct result of an illegal search or seizure and . . . evidence later discovered and found to be derivative of an illegality, the so-called fruit of the poisonous tree." *Utah v. Strieff*, 579 U.S. ___, 136 S. Ct. 2056, 2061 (2016) (internal quotation marks omitted) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)).

Ordinarily, the defendant bears the burden of proving by a preponderance of the evidence that the evidence at issue was obtained in violation of the Fourth Amendment. *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001). However, when law enforcement officers conduct a search or seizure without a warrant, the government bears the burden of proving by a preponderance of the evidence that the search or seizure was constitutional. *United States v. McKinnon*, 681 F.3d 203, 207 (5th Cir. 2012).

### III.   DISCUSSION

Defendant asks the Court to suppress evidence of his status as an alien, as well as evidence in his immigration file, and the testimony that agents found Defendant in the United States. (*See generally* Doc. 13). Defendant grounds his requests on an alleged Fourth Amendment violation. *Id.* Specifically, Defendant claims his Fourth Amendment right against unreasonable searches was violated when Mr. Patel opened the hotel room door to provide agents access to Defendant's hotel room. *Id.*

### A. Defendant's Identity & Immigration File

Although Defendant asks the Court to suppress his identity and immigration file based on the alleged Fourth Amendment violation, he acknowledges that Fifth Circuit precedent precludes the suppression of identity and immigration file evidence. (Doc. 13 at 4). The Fifth Circuit has held that an INS file and an individual's identity is not suppressible as fruit of the poisonous tree. *See United States v. Roque-Villanueva*, 175 F.3d 345, 346 (5th Cir. 1999). Accordingly, Defendant's Motion to Suppress as it relates to his identity and immigration file is denied regardless of any Fourth Amendment violation.

The only question remaining is whether the Court should suppress the agents' observation of Defendant.

### B. The Agents' Observation of Defendant

The parties agree that Defendant's Fourth Amendment rights are only violated if Mr. Patel was acting as an agent of the Government. (*See* Docs. 19, 13).

> It is well settled that if a private party wrongfully conducts a search or seizure of another's person or property the Fourth Amendment is not violated and that such private misconduct does not deprive the Government of the right to use evidence that it has obtained legally. The question is whether, in view of the circumstances of the case, the private party acted as an instrument or agent of the Government when he conducted the search.

*United States v. Blocker*, 104 F.3d 720, 725 (5th Cir. 1997) (internal citations omitted). To determine whether the private party acted as an agent of the Government, courts turn to the following factors: "(1) whether the Government knew or acquiesced in the intrusive conduct; and (2) whether the private party intended to assist law enforcement efforts or to further his own ends." *See id.* (citations omitted). "The movant has the burden to establish both factors in order

to show the private party acted as a Government agent or instrument." *United States v. Thompson*, No. CR 14-153, 2016 WL 3476714, at *7 (E.D. La. June 27, 2016).

### 1. *Whether the Government Knew or Acquiesced in the Intrusive Conduct*

The Fifth Circuit "has applied the Ninth Circuit's test to determine whether a private party is acting as an agent or instrument of the Government." *United States v. Thompson*, CR 14-153, 2017 WL 6325818, at *13 (E.D. La. Dec. 11, 2017), *aff'd sub nom. United States v. Williams*, 774 F. App'x 871 (5th Cir. 2019) (citing *Blocker*, 104 F.3d at 725; *United States v. Pierce*, 893 F.2d 669, 673 (5th Cir. 1990); *United States v. Bazan*, 807 F.2d 1200, 1202–04 (5th Cir. 1986)). In *United States v. Miller*, the Ninth Circuit stated that with regard to the first factor, "de minimis or incidental contacts between the citizen and law enforcement agents prior to or during the course of a search or seizure will not be subject to Fourth Amendment scrutiny." 688 F.2d 652, 657 (9th Cir. 1982). Rather, the Government's involvement must be "either directly as a participant or indirectly as an encourager of the private citizen's actions . . . ." *Id.* "In some affirmative way, the police must instigate, orchestrate, encourage or exceed the scope of the private search to trigger application of the Fourth Amendment." *United States v. Smythe*, 84 F.3d 1240, 1242 (10th Cir. 1996).

Agent Drake testified he was recovering from the shock caused by Mr. Patel's conduct—walking away from him mid-conversation without warning—when he noticed Mr. Patel walking toward Room 115. Furthermore, all agents credibly testified that they did not know Mr. Patel would open the door. Mr. Patel also testified that none of the officers asked him to open the door. Consequently, the Court rules the evidence introduced at the suppression hearing establishes the agents did not directly participate in opening the door to Room 115—the intrusive conduct.

As to whether the agents indirectly encouraged Mr. Patel's actions, the analysis is more complex. There is evidence the agents informed Mr. Patel that the door may have to be broken and that the agents would have to undergo a long process to obtain a warrant to open the door.[4] However, there was no evidence indicating the agents affirmatively encouraged Mr. Patel to open the door, or even insinuated as much. Rather, it appears the agents attempted to explain to Mr. Patel that they could not open the door to Room 115 without the occupants' acquiescence, that they would have to obtain a warrant to open Room 115, and that there was a possibility the door would have to be broken to get it opened. Based on the testimony of the agents, which the Court finds credible, their conversation with Mr. Patel was investigative and informative as the agents were gathering information regarding Room 115 because of their interest in the occupants. Contrary to Defendant's contentions, the Court does not believe the agents affirmatively instigated, orchestrated, or encouraged Mr. Patel to open the door. Finally, Mr. Patel unequivocally testified that the agents did not tell him to open the door.

Further, although the agents engaged in a conversation with the occupants of Room 115 after the door was opened, the Court finds that fact irrelevant to the inquiry. The evidence Defendant seeks to suppress is the agents' observation of Defendant when the door was opened. The agents' observation of Defendant took place immediately when the door was opened.

---

4. Mr. Patel testified on direct and cross-examination that the agents informed him they might have to break the door to get it opened and that they would have to initiate a long process to obtain a warrant. Agent Drake was asked whether he informed Mr. Patel the agents would have to undertake a long process to obtain a warrant and whether he, at any point, indicated the agents might have to break the door to gain entry. As to the former question, Agent Drake testified: "I don't recall that." As to the latter question, Agent Drake testified: "No, I don't recall that." Agent Drake does not contradict Mr. Patel's testimony that an agent communicated to him (Patel) that a long process might be forthcoming and that the door might have to be broken. Rather, he merely states he does not recall. Further, Mr. Patel testified on direct-examination: "So they told me that it's a long process for us to open the room and break the door. So, I don't want them to break my door." Next, when asked by defense counsel whether he was given the impression that the agents might have to break the door down, Mr. Patel answered, "Yes." On cross-examination, in response to the Government asking whether the officers asked him to open the door, Mr. Patel answered: "No. . . . They just told me it's a long process for us, and we have to break the door. So, I told them I will open the room for you, and I open with my master key." Based on Mr. Patel's consistent testimony and the fact that his testimony was not contradicted, the Court finds Mr. Patel's testimony credible.

Accordingly, in obtaining the evidence in question, the agents did not expand or exceed the scope of Mr. Patel's search.

The Court holds the Government did not know Mr. Patel would open the door, nor did it acquiesce to Mr. Patel's intrusive conduct.

Defendant points to *Lustig v. United States* for support. (Doc. 20-1 at 2). However, the Court finds *Lustig* inapposite. In *Lustig*, the state officers (who were considered private citizens) "concerned themselves especially with turning up evidence of violations of the federal counterfeiting laws after [the federal agent] joined them" because he was an expert in counterfeiting matters. 338 U.S. 74, 79 (1949). Further, the federal agent had a "vital share in sifting the evidence as the search proceeded" and "exercised an expert's discretion in selecting or rejecting evidence that bore on counterfeiting." *Id.* Accordingly, the Supreme Court held the federal agent had a hand in the search and found the evidence acquired during the search inadmissible. *Id.* Here, the agents did not encourage or ask Mr. Patel to open the door. Further, as soon as the door to Room 115 was opened, the agents observed Defendant. They did not have to approach the room or initiate a conversation with the occupants before they observed Defendant inside the room. Consequently, they did not have a hand in the search.

### 2. *Whether the Private Party Intended to Assist Law Enforcement Efforts or to Further His Own Ends*

As to the second factor, Defendant argues Mr. Patel's true intention was to assist the officers in their investigation. (Doc. 13 at 4). At the hearing, Mr. Patel made numerous statements concerning why he opened the door. On direct-examination, Mr. Patel stated that when he observed the officers unsuccessfully execute a knock and talk, he believed he "[had] the right to open [his] room" and "so [he] opened [Room 115] for them." He also answered affirmatively when defense counsel asked whether he was hoping to help the agents in their

investigation and stated he opened the door himself "because [he] want[ed] to help the officer people." Mr. Patel later explained that the officers had informed him they might have to obtain a warrant to open the door, undergo a long process, and possibly break the door. Mr. Patel then stated that he did not want his door broken and so he decided to open the door himself. On cross-examination, Mr. Patel repeated that he opened the door because he did not want the door to be broken. However, at no point did any of the agents ask Mr. Patel to open the door or threaten him with breaking the door if he did not open it. Rather, the agents explained to him why they could not enter Room 115 without the occupants' permission and why a warrant, and possibly breaking into the room, might be necessary. Finally, the Court notes Mr. Patel testified that he opened the door because he suspected criminal activity was occurring in Room 115 and he did not want illegal activity taking place in his hotel.

Although Mr. Patel testified he wanted to assist law enforcement officers, the Court finds he was motivated by his desire to help himself. This conclusion is evidenced by Mr. Patel's statements that he did not want his door broken and that he did not want illegal activity taking place in his hotel. Presumably, Mr. Patel was worried about how this incident might affect his business and was acting to protect his own private, business interests when he opened the door. If Mr. Patel actually intended to help law enforcement, he would have followed their direction when they advised him that they could not open the door due to privacy concerns.

Finally, the Court agrees with a statement made by the Seventh Circuit: "[I]t should come as no surprise when the goals of private individuals or organizations coincide with those of the Government." *United States v. Koenig*, 856 F.2d 843, 851 (7th Cir. 1988). The Seventh Circuit cautioned against relying solely on a statement that a private individual wished to do the right thing or assist law enforcement  "because the United States of America is a democracy in which

individual citizens *are* the Government . . . ." *Id.* The Seventh Circuit advised that such a "happy coincidence does not make a private actor an arm of the Government." *Id.* Accordingly, the Court finds Mr. Patel's testimony that he wanted to help the officers in their investigation, alone, is not sufficient to show that he was acting with the intention of assisting law enforcement, particularly when there is testimony suggesting Mr. Patel was concerned about his business's entanglement with criminal activity.

The Court finds Mr. Patel intended to further his own ends.

*   *   *

In sum, the Court rules that, in view of the circumstances of the case, Mr. Patel did not act as an instrument or agent of the Government when he opened the door to Room 115.

### IV.   CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's Motion to Suppress. (Doc. 13).

It is so **ORDERED**.

SIGNED this 11th day of November, 2020.

_____
DAVID COUNTS
UNITED STATES DISTRICT JUDGE